arguments in this case. And we'll proceed to hear argument in the last case on calendar for argument today, which is 25-300 United States v. James Vernon Day. And we will hear first from Mr. Lackney. You may proceed. Good morning, Your Honors. May it please the Court, Peter Lassney appearing for James Vernon Day, Jr., if I may reserve three minutes for rebuttal. The Fourth Amendment requires both probable cause and particularity. We talk about probable cause almost daily in criminal courts, and particularity less so, but it's just as important. As the Supreme Court reminded us in Groh, a warrant that's not particular is really no warrant at all. And it's for that reason the District Court erred in upholding the search in this case. When we talk about the warrants in this case, when you look at them, they are particular only on the largest macro level. They don't talk about the fact there's two residents at the property. No, but it makes clear that they are referencing the entirety of the property, which, you know, at least in some official sources, had one number. And they said the main residence and the outbuildings, and in particular his residence, now it turned out his residence is not the main building, it's one of the outbuildings. But everything is covered. It's all there. So, you know, overbreath doesn't mean it's not particular. I mean, it's broad, but they had probable cause because of the nature of what they're looking for, a car which has potentially been disassembled and the pieces are scattered around in, you know, this very large property where there were cars kind of all over the place. Just why isn't that sufficiently particular? It's a lot of things, it's particularly specifying many things, but why isn't that sufficiently particular? Yes, Your Honor. It's not sufficient because of the officer's knowledge. That's where I think we need to start here. The district court went to Alexander right away in looking and holding as the court's  And Alexander looks back to this case Whitney, and that's where this issue of knowledge, I'm sorry, this knowledge of probable cause collapsing with a particularity argument starts. And I think it starts in Whitney because their officers come up to one building and they don't know at the time of the search that the thing had been turned into two buildings, I'm sorry, two separate apartments. Whitney was a case where there was one building, you kind of enter, there's a split level, you could go high or low, and the defendant there said, whoa, whoa, whoa, you can't come in to the basement, that's not particular enough. And the Ninth Circuit looked at that and said that, well, you know, there's no knowledge at the time of issuance. And I think they're picking up on this idea from Garrison. At the time of issuance, they didn't know. That's different than here. I believe the record supports the idea McCarthy knows there's two homes on that residence the day before. He's told that by Mr. Day. There are two mailboxes at the end of the driveway. I know he says he didn't see them, but they're right there. Just like how he could look into that property and apparently see these car parts, the mailboxes are there. So there's notice, absolutely, at issuance the day before. But if the goal is to look for these parts and you explain to the issuing magistrate the, you know, probable cause as to why I believe the parts are there and why I think they could be in these various buildings and I want to go into the, you know, the outbuildings, which was very clearly requested and put into the warrant. Why does it matter whether the outbuilding is being used as another residence or a storage shed or why does that ultimately matter to particularity? The magistrate judge knew that the judge was being asked to authorize a search of the outbuildings and decided to do so. It matters for two reasons, Your Honor. The first part is to call this an outbuilding. And I know that's what the government, that's the position they take at the district court. It's not an outbuilding. It's my client's house. It was separately addressed by the time. The Fourth Amendment gives the highest protection to homes. That's from Jardine's. But it also did say they wanted to search his residence specifically. It said it wanted to search 1550, which was the home of his mother, Your Honor. 1552 is the home that the government's calling an outbuilding. But at the district court, McCarthy. But legally, this was one lot. I mean, this is registered, you know, for tax purposes and if you were to sell it, it's one lot. I agree with that. The problem, though, Your Honor, with looking at probable cause for the whole lot and allowing it to somehow eviscerate particularity as to each residence, you know, that would make the particularity requirement of the Fourth Amendment a paper tiger. If, you know, essentially that argument, Your Honor, that the government made that the district court adopted is that if an individual, if there's probable cause to search his property, that person has common control of the whole property, the warrant doesn't have to be specific at all. You know, you can leave that section blank. That's essentially happened. That is what happened in Grow. Now, granted, it was about things to be seized, but the court said that's facially invalid. If you don't put in there what you're looking for, then the warrant's no good. So taken to its logical extreme, that's what happens if we rely on probable cause and say particularity doesn't matter at all. Didn't the district court credit Officer McCarthy's statement that he checked the 1550 address, that he looked at the database, he looked at Mr. Day's driver's license, vehicle registration, et cetera? So why isn't that enough, you know, the officer said he checked these different various governmental sources. It said that he lived in 1550, and the warrant describes everything in 15, all the property in 1550. Yes, Your Honor. So I think I would look to Garrison, or I'd point the court to Garrison, that let's say I concede, and I'm not, but let's give it to the government that, right, at issuance, McCarthy knows or thinks there's just one residence there. Once we get to execution, totally different ballgame. And Garrison says that if officers learn during execution of a warrant that it's overbroad and not particular, they have to stop. And if they don't, a further search violates the Fourth Amendment. Setting aside what I believe or what I think the record shows about what McCarthy knew when he got the warrant, there's no question during execution he knows there's two homes there. How do we know that? He gets to the residence, shows the warrant, and Mr. Day says to him, that's not good enough. I'm in 1552. And even in McCarthy's own words, Day retreats towards his residence, his home. They talk to Ms. Day, and Ms. Day looks at the warrant, tells them, sorry, Jim's house across the way is 1552, this is 1550. So following the Supreme Court's lead there, Your Honor, that's the difference. Even if at issuance, he looked at the driver's license, he looked at administrative records, not determinative, once he is on the scene, once he learns that the homes are different and that there's different privacy interests there. Does he have to credit Mr. Day's statement that he lives in 1552 when the officer's belief, based on governmental records, it's everything's 1550, everything in that property's 1550? That's a fair question, Your Honor. My view is yes. At least he's hearing this now from two people. Whether he, what he knew at issuance, I know we're setting that aside, but he hears this over and over. The officers themselves are showing reluctance to go into 1552. In Excerpt to Record 28, we know he wants in. In Excerpt to Record, McCarthy says, I want in that effing house. And he has the warrant for 1550, so there's some hesitation there to go into the home. So what he should have done, Your Honor, is simple. He could have kept the other agents that were there on scene. He could have went back to Magistrate Owen and shared with her, like the Constitution requires that, Your Honor, there are actually two homes at this address, each with their own resident and Fourth Amendment protection. So who created the separate address, and for what purpose? Because there's still one legal lot. So who created it, and for what purposes? I don't have the answer for Your Honor on that right now. I believe my client did, Your Honor, and it was— But some agency had to have changed it, and then for what purpose? Because he still had 1550 on his driver's license, didn't he? Correct. The driver's license was obtained years prior to, well before the—I'll use the term subdivision of the lot to both 1550 and 1550. But it's not a subdivision. I mean, this was—you can split a lot and then create two lots with seven, and if that were true, it would be a really different case. But it's not two lots. It's one lot, and it was presented to the magistrate as one lot with a lot of different buildings on it. Yeah, Your Honor, and I respectfully disagree that these property rights ideas are what determine Fourth Amendment protection. If you think of a scenario that would be pretty common in Montana or any rural area where we have a ranch house, and there's also a hired person that helps at the ranch, and the cops—and it's all in one parcel, we'll go with your hypothetical. There's no subdivision, one parcel, two residences. If law enforcement develops probable cause that the ranch hand has committed a crime, and they write a general warrant like they did in this case, just describing the lot, without a particularity direction to the officer, the ranch owner's home is subject to search just as the ranch hand's. So probable cause and particularity, again, two different things, and that's why particularity exists. Otherwise, it motivates and incentivizes law enforcement to write these warrants as general as possible, so that if we're in a situation like this, they can say, well, we generally identified the lot, that's enough. It's not under GRO. Does it matter that the officers saw firearms in plain view once they reached the son's house? No, Your Honor, because at that point, they entered the son's house, which's address is 1552. They entered that before they got the subsequent warrant. They entered in the first warrant for 1550. So they go into the home, see the warrants there, and then use that observation to get the subsequent warrant. So if the first warrant's invalid as to particularity, then there's no legal entry into son's home. In terms of cases that are on point, I pointed out in my brief, it's unpublished, but Alcazar is a case that, the closest on point in the Ninth Circuit, and this is a case where agents report to the property. They find two mobile homes on it. And importantly, the officers in that case knew there were two homes on this property before they wrote a warrant, only particularly the describing one. On appeal, Alcazar says the warrant is not particular enough, and in accepting that, the Ninth Circuit pointed out specifically what officers knew at the time of execution and what they learned, or what they knew at issuance and what they learned at the time of execution also. I have a second issue I wanted to raise and talk briefly about as well, Your Honors. The district court, when I was cross-examining Deputy McCarthy in this case, the district court precluded cross-examination into some areas that were highly relevant to Deputy McCarthy's credibility. Due process, as well as the Sixth Amendment, gives a defendant the right to confront witnesses at any case or at any critical stage of the criminal proceedings. There's no question a suppression hearing is one of those. The government had disclosed to me, Brady, information early on that I began cross-examining the officer on and was precluded from exploring in depth. And as laid out in my subsequent motions to supplement the record, my efforts there were not a fishing expedition by any means. I was asking questions that would have went directly to the affiant's credibility and questions that I believe would have ... Did the district court explicitly tell you to stop or just say, kind of, wrap this up, move on? Because you actually then, after the district court, you asked another question relative to this line of questioning and then yourself stopped. Do I have that correct? You're correct, Your Honor. It sounded like he was like, you're getting far afield, wrap it up. I'll give you some leeway, but not much more. You could read it that way and it doesn't look like an order not to do it. It looks like I'm trying to balance it and then you wrapped it up. You could read it that way and I'll leave you with this, Your Honor, and I'm sure my friend will agree. When this district court, as much as raises an eyebrow or tells you to move on, you do it. No questions asked. So, that's how I took the directive and I moved on. Your Honor ... You want to save your time for rebuttal? Yes. Thank you, Your Honor.  Thank you, counsel. We'll hear now from Ms. Sable. Did I pronounce that correctly? Correct, Your Honor. Okay. Thank you very much. Good morning, Your Honors. May it please the court. Kelsey Sable from the District of Montana on behalf of the United States. Your Honors, the case law is clear that we view search warrants in a common sense, realistic way, looking for practical accuracy and not hyper-technical precision. Under that standard, it is clear that both the first warrant, the stolen truck warrant, and the second warrant, the firearms warrant, were sufficiently particular to describe the places to be searched. The first warrant, the stolen truck warrant, sought search of the entire property, the entire 18 acres at this address, because the entire thing was suspect for stolen vehicle parts. It's clear that there is simply no other property that officers could have gone to under this warrant. They knew it was ... Why not tell the magistrate that there's actually two separate residents here? It seems kind of like pertinent information to how widely you can search the entirety of the lot. And am I wrong in recollecting that the warrant application only mentioned one residence and didn't refer to any others? You are correct, Your Honor, that the warrant ... The thing is that it references a main residence, and then it says that he lived there with his wife, the first warrant, but it doesn't say that he doesn't live in the main residence. It does not identify another residence, Your Honor? The magistrate judge reading that would think that he and his wife live in the main residence. I think that's true.  That turned out to be false, Your Honor, but I don't think the officers knew that at the time. Well, they knew that by the time of the second warrant, correct? They knew that by the time ... And they still didn't put anything in about that. That's correct, Your Honor. But I think with respect to the second warrant ... This isn't how it should be done. This could be done a lot more cleanly, and just give the magistrate judge the information to make the judgment. If you were writing ... This came from the state system. If you were writing this, you wouldn't write it this way, I would hope. Your Honor, I think anyone from our office probably would include both addresses in the second warrant, 1550 and 1552, and perhaps include a little additional detail describing the layout of the property. But that's not constitutionally required. Again, we look for practical accuracy, and under the second warrant, it was very clear when we view the warrant, we read it as a whole, that they were looking to search inside the residence of James Day. But your response to ... I mean, it's not the facts of this case, but suppose you had an identical warrant, refers to all the outbuildings and all the rest. One of the outbuildings is the ranch hand's personal residence, lives there with his wife and children, and then you'd claim the magistrate judge authorized the search of that as well, because it's one of the outbuildings, so it's officially particular. Would that be right? Is that problematic? Well, so I think two points on that, Your Honor. I think that sort of depends on the circumstances of what they're seeking to search and why. So in this case, the warrant, and I think this is important, the warrant identified probable cause with respect to Mr. Day. And when they arrived on the property that day, they learned that there was a separate residence for Mr. Day and Mrs. Day. And this Court's case law in Whitney and the Court references in Johnson, which I think does stem from Garrison, that when officers arrive on scene and realize that there are two separate dwelling units, they must confine their search to the residence of the suspect. And that's what officers did here. So to your hypothetical, if they were, you know, seeking to search the residence of the ranch hand, and they realized that there was a residence belonging to somebody not the ranch hand, I think probably, I mean, unless the entire premises were suspect or were under common control, as this Court discussed in Alexander, the appropriate course in that situation would be to confine the search to the house of the ranch hand. And I think if the contrary were true, that they were seeking to search the residence of the owner of the property, and then they come, you know, on scene and realize that there's a separate dwelling unit for the ranch hand, they confine their search to the residence of the suspect, the ranch owner. You know, and I think that's more, I did want to address the Alcazar Barajas case because, you know, I think that distinction is relevant in that case as well, you know, which Mr. Day relies on. And I think that's, it's not, it's not clear necessarily from the face of the opinion, but it is clear from the briefing that was filed in that case. You know, the opinion does reference in footnote to a fugitive. I mean, the briefing makes clear that the fugitive they were looking for was not Mr. Alcazar Barajas. And so they go to this large, you know, rural property to search for the fugitive. And they encounter Mr. Barajas in one of these mobile homes, and they go forward and search, you know, his mobile home as opposed, you know, when he, when they know he is not the fugitive that they're looking for. And I think another fact in that case that is incredibly important and that makes it distinguishable from this circumstance is that officers knew at the time that they sought the warrant that there were two mobile homes on the property, and they only identified one of the mobile homes in, in the warrant application. And so there was no way for them to know which mobile home when they got there that day was the one that they were seeking to search under the warrant. And so that's... At the time of the second warrant, they know that what they're really interested in is one of the outbuildings and not the main, the so-called main residence. Yet, they didn't change the formulation, the description of the property. Well, I think there's two reasons for that and for why that's not problematic, Your Honor. You know, the first is, they were of the understanding, and it's supported by all of the records, the cadastral records, the driver's license, the motor vehicle registration, that the correct legal address for this property was 1550. And the, using that address on the warrant was an attempt to reflect the accurate legal address that they were searching. You know, they can't and shouldn't just take Mr. Day's word for it that his house is 1552, you know, when they did all this research beforehand to determine that the address was 1551. And I think another point, Your Honor, is that they were, you know, as Deputy McCarthy testified, they were trying to include not just inside Mr. Day's residence, but also the shop that they had already searched under the first warrant and where they had found the rifle. And that, you know, the validity of that seizure is not and has never been disputed with respect to that firearm. But they were trying to include, you know, that shop, which was located on the broader acreage that's been referred to as 1552. And, you know, another point I'd like to be sure to make with respect to the firearms warrant is that, you know, the officers, in our view, didn't even need to go back to the magistrate and obtain this second warrant. You know, they were trying to do everything right and be extra cautious. But they, once they entered Mr. Day's residence under the first warrant, the stolen truck warrant, and observed these firearms in plain view, you know, they were aware of Mr. Day's felony status. And so this court's case law is very clear that those firearms were immediately incriminating and they could have seized them. You know, but they didn't. They went back to the magistrate and they explained, we searched this residence under this first warrant. We observed these firearms. Mr. Day is a felon. We want to go back in and search inside Mr. Day's residence, this place where we just viewed the firearms, to seize them. They didn't need to do that. But I, you know, I think that that explanation, you know, makes really clear that when you read that second warrant as a whole, they know exactly, you know, what they're going to search under this warrant. There is no practical possibility that they're going to now go search inside the main house or search somewhere else. They're saying, we just saw firearms. We want to go back inside this residence and get those firearms. So I, there's no, and again, Deputy McCarthy was the one who applied for and executed this warrant. So, you know, he knows exactly where he's going with respect to this warrant. I mean, but that's what's so strange in the second warrant, because they were asking for permission to search any room, storage areas, cabinets, et cetera, to include outbuildings and the main residence, garages, shops, et cetera. And then, you know, they go through and say on December 19th, 2023, while serving a separate search warrant at this address, we located blah, blah, blah in the residence. The firearms were seen directly. The magistrate reading this is clearly going to think that that means the main residence and not one of the outbuildings. So I just, why was it done wrong like this? Well, so I think, Your Honor, I don't think it is wrong, but I think, you know, with the officers at the time-  They referred to a residence in the next paragraph and the paragraph before only refers to a main residence, and they're not talking about the same building. The magistrate judge doesn't know that. Well, I think the officers use main residence to refer to Mr. Day's residence, because that's the residence they were always seeking to search under both of the warrants. And then that's the residence that they searched. And again, you know, they at no time searched Mrs. Day's residence. You actually think that main residence in there refers to the 1552 outbuilding? Well, so I think in the first warrant, Your Honor, that the main residence refers to what we later learned was Mrs. Day's residence, and that's based on the property records, because that was identified as the main residence, and then the outbuildings were also listed on those records. And then Mr. Day's, it turned out that one of those outbuildings was converted into Mr. Day's residence. And so we refer to, you know, the main residence, and the district court sort of touched on this in its order, that we've been calling, you know, the main residence, we've been using that term to refer to Mrs. Day's residence, because that's what was reflected in the property records. You know, but I think the warrant is clear that officers were trying to search Day's residence, and they absolutely could have described it in more detail as an outbuilding that has been, you know, has been turned into a separate residence. They absolutely could have said an outbuilding that's been turned into a residence that is, that Mr. Day calls 1552 on the larger parcel of 1550. But what's clear from all of these records is that this property is one single address, whether it's 1550, 1552, or something else. This whole entire property is one plot of land, and they're trying to get onto this land to search inside Mr. Day's residence, and that's the area that they searched. I mean, there's just no possible way that these officers would go to any other property or would go to, you know, any other piece of land under these warrant, under this warrant, and there's no reasonable likelihood that they would have gone in under the second warrant and searched Mom's house, just because the warrant refers to the main residence, because they were very clear in the affidavit that they're looking to search inside of James Day's house, the structure where they observed these firearms. And from a particularity point of view, there's no question that the second warrant does authorize searching the Mom's house. Unambiguously it does, doesn't it? I think it does, and I do think... They chose to forbear doing that, but it clearly does authorize it, doesn't it? I think it... Did he have access to that residence or no? I think he did, and I think this goes to the sort of, to the common control piece of this. I mean, you know, officers chose not to search Mom's residence, but that absolutely does not mean that they could not have searched Mom's residence or did not have probable cause to search Mom's residence. And the district court, you know, found in its order that they absolutely could have searched Mom's residence because the entire premises were suspect for stolen vehicle parts and because Mr. Day was in common control of this entire residence with his, or this entire property with his mother, which was supported by, you know, their observations of her health and physical condition by the fact that he ran the... Counsel, what would have happened if, say, the property record showed one address for 18 acres, but Mr. Day had gone around and hung signs up, four different signs at various parts that subdivided the number? And it's not in any official record anyway, it's just something he did. What impact would that have on what could be searched? I don't think that would have an impact, Your Honor, because as the Stolen Truck Warrant establishes, you know, this is one whole property and all of that property is suspect for stolen vehicle parts. And the officers knew that at the time they searched the warrant because they observed, you know, disassembled vehicles all over this property. So if part of the property was 1550, part of it was 1552, part of it was 1554, according to Mr. Day, I mean, they sought and obtained authorization to search every piece of it and every piece of it, you know, there was probable cause for stolen vehicles. So I don't think that changes the analysis, Your Honor. And I did just want to address briefly the issue with respect to cross-examination of Deputy McCarthy. You know, we think it's clear from the record that the District Court did not restrict Mr. Day's cross-examination. He might have expressed some hesitation or skepticism about the relevance of this line of questioning, but he did not tell him he could not cross Deputy McCarthy. And we know that because he asked an additional follow-up question during his cross after the District Court interjected. You know, I think it's also not entirely clear what of, you know, the issues raised in the motion to supplement the record would have come out on cross-examination, but even assuming all of them did, it doesn't really change the analysis in this case and on these facts because everything Deputy McCarthy did and said and testified to is supported by independent records, the property records, the driver's license records, the body cam records. I mean, there's just, there's nothing that would have come out from any cross-examination that would have changed the facts or the court's analysis in this case. So we respectfully request that this court affirm. All right. Thank you. Thank you, Counsel. We'll hear rebuttal now. Your Honor, a lot of what the government said in response was this. McCarthy knew what he wanted to search, no harm, no foul. That completely inverts the Fourth Amendment requirement that a magistrate approve, not just probable cause, but particularity. The magistrate has to know, the magistrate has to give the authority to do that. And in saying that McCarthy knew the place he wanted to go, I fundamentally disagree with that. Somehow resolves the case. Do you dispute that Day had common control over the entirety of the property? Was there any portion of the property that he did not have control or access to? That's a fair reading of the record. I'm not conceding that, Your Honor, but it's a fair reading. I could see how the district court came to that. It wasn't really litigated at the district court level. There was not a lot of discussion. One thing I'd point to the court is the government, like I said, if you take that common control, which to me is a probable cause issue, not a particularity one. And that's where, if we keep these ideas separate, which they are, they serve different purposes. Probable cause is, is there going to be evidence of crime? Particularity is, where is it? If you take common control, like I said in the ranch hand example that the court brought up, it swallows the ranch owner's Fourth Amendment right to be free of unreasonable search and seizure if some type of common access to the property is determinative. And I'll leave the court with this, too. It's a quote from Marilyn V. Garrison, and this is key to the question of notice. There's this idea that, you know, he looked at all the property records and looked at the driver's license. There's no dispute. When he gets on that property, he knows there's two homes. He sees them. He doesn't have to take Day's word for it. He sees there's two homes. There's some trepidation into going to home, too. The Supreme Court wrote about the cops in Garrison, as the officers recognized, they were required to discontinue the search of Respondent's apartment as soon as they discovered there were two separate units on the third floor, and therefore were put on notice of the risk they might be in a unit erroneously included within the warrant terms. That carries the case, Your Honors. If nothing further, I'd submit. All right. Thank you, Counsel. The case just argued will be submitted, and the Court, for this day, will stand in recess. All rise.
judges: COLLINS, LEE, Fitzwater